**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION**

Civil Action No.:

UNITED STATES SECURITIES
AND EXCHANGE COMMISSION,

                              Plaintiff,

        v.

DOUGLAS E. ELSTUN,

                              Defendant.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiff United States Securities and Exchange Commission (the "SEC"), alleges as follows against Defendant Douglas E. Elstun ("Elstun" or "Defendant"):

## <u>SUMMARY</u>

1.      Elstun, an investment adviser and formerly the owner of the investment advisory firm Crossroads Financial Management, Inc. ("CFM"), owed his clients a fiduciary duty to act in their best interest and to fully disclose all material facts to them. Rather than comply with that duty, Elstun defrauded his advisory clients in three primary ways.

2.      <u>First</u>, Elstun charged certain professional athlete clients higher advisory fees – an annual percentage of their assets that he charged for managing their assets – than what they had agreed upon. In addition to charging these improper fees on the client assets he managed, Elstun further defrauded certain clients by charging advisory fees on assets that were not covered by their agreements. This included charging clients to "manage" bank account balances, equity in

homes and other real estate, and the value of vehicles. As a result of this conduct, Elstun overcharged these clients by over $360,000. To further his fraud and avoid detection, Elstun directed his CFM administrative staff employees to fabricate advisory agreements with phony fee percentages, which he then produced to the SEC staff.

3. <u>Second</u>, Elstun misled advisory clients about his trading in high-risk, daily leveraged and inverse Exchange Traded Funds ("ETFs"). Rather than engage in a short-term trading strategy with these highly complex financial instruments, which are designed to typically achieve their stated objectives on a daily basis, Elstun bought and held these products for months and, for some clients, years, and at times promised clients that these investments would be profitable if the investors continued to hold them. Despite engaging in this strategy, Elstun never explained to clients the substantial risks of these ETFs or discussed the impact of his unconventional trading strategy. Moreover, Elstun described these daily leveraged and inverse ETFs as "insurance" or a "hedge" for these clients' investment portfolios when, in reality, by holding these investments for long periods, the investments created significant risk for clients.

4. <u>Third</u>, Elstun made unsuitable investments for advisory clients. Specifically, Elstun made unsuitable and risky investments in daily leveraged and inverse ETFs that were inconsistent with certain clients' investment objectives and risk tolerances.

5. Elstun's unsuitable purchases of these daily leveraged and inverse ETFs and his sustained buy and hold strategy resulted in his clients losing millions of dollars.

6. As a result of the conduct described herein, Elstun violated and, unless restrained and enjoined, will continue to violate Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 (the "Advisers Act") [15 U.S.C. §§ 80b-6(1) and 80b-6(2)]. In the alternative, Elstun aided and abetted CFM's violations of Sections 206(1) and 206(2) of the Advisers Act [15

U.S.C. §§ 80b-6(1) and 80b-6(2)]. Elstun also aided and abetted CFM's violations of the recordkeeping, custody, cash solicitation, and compliance provisions of the Advisers Act as set forth in Sections 204(a) and 206(4) of the Advisers Act [15 U.S.C. §§ 80b-4(a) and 80b-6(4)] and Rules 204-2(a)(10), 206(4)-2, 206(4)-3, and 206(4)-7 thereunder [17 C.F.R. §§ 275.204-2(a)(10), 275.206(4)-2, 275.206(4)-3, and 275.206(4)-7]. Unless restrained and enjoined, Elstun will continue to aid and abet violations of these provisions.

## JURISTIDCTION AND VENUE

7.      The SEC brings this action pursuant to the authority conferred upon it by Sections 209(d) and 209(e) of the Advisers Act [15 U.S.C. §§ 80b-9(d), 80b-9(e)]. The SEC seeks a permanent injunction prohibiting Elstun from further violations of the provisions set forth above and an order requiring him to disgorge, with pre-judgment interest, his ill-gotten gains from the conduct alleged in the Complaint pursuant to Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9(d)]. Additionally, the SEC seeks civil penalties against Elstun pursuant to Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)], as Elstun's conduct involved fraud, deceit, or deliberate or reckless disregard of regulatory requirements and resulted in substantial loss, or significant risk of substantial loss, to other persons.

8.      Venue lies in this Court pursuant to Section 214 of the Advisers Act [15 U.S.C. § 80b-14] because certain acts or transactions constituting the violations of the federal securities laws detailed herein occurred in this district. Elstun's advisory firm, CFM, through which he acted and committed the violations alleged in this Complaint, prior to its close, had its principal place of business in this district during a portion of the time period during which Elstun violated, and aided and abetted CFM's violations of, the federal securities laws. Additionally, Elstun defrauded multiple clients who, according to their account statements, reside in this District, and

3

Elstun sent emails to those clients containing false and misleading statements that are subjects of this Complaint.

9.      In connection with the transactions, acts, practices, and courses of business described in this Complaint, Elstun and CFM, directly and indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the means and instruments or transportation or communication in interstate commerce.

10.      Elstun entered into a tolling agreement to toll the running of any statute of limitations against him from May 17, 2019 to April 28, 2020 and from August 19, 2020 to November 30, 2020.

## DEFENDANT

11.      **Douglas E. Elstun**, age 52, is a resident of Lenexa, Kansas. From at least 2013 until it ceased doing business in approximately August 2019, Elstun owned 75% or more of CFM and controlled its operations. Elstun functioned primarily as an investment advisory representative ("IAR") associated with CFM, and also served as CFM's Investment Manager and Chief Compliance Officer ("CCO"). Elstun is currently associated with a different investment adviser registered with the SEC.

## OTHER RELEVANT ENTITY

12.      **Crossroads Financial Management, Inc.**, was a Kansas corporation that was formed in April 2013 and from approximately October 2018 to August 2019, when it ceased doing business, had its principal place of business in Kansas City, Missouri. Prior to that time, CFM's principal place of business was in Lenexa, Kansas. Crossroads Financial Management, Inc., was the successor to the investment advisory business of Larmer & Elstun LLC, which was the successor to the investment advisory business of William B. Larmer & Associates (collectively referred to as "CFM"). CFM registered with the SEC as an investment adviser in

March 2006 and terminated its registration as of August 23, 2019. CFM was dissolved in July 2020.

## FACTS

### I. Elstun and CFM Were Investment Advisers and Owed a Fiduciary Duty to Their Clients.

13. From March 2006 to August 2019, CFM was registered with the SEC as an investment adviser and was an investment adviser within the meaning of Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)]. CFM was in the business of providing investment advice concerning securities for compensation, and, according to its Form ADV filed with the SEC, as of December 2018, it had approximately $125 million of client assets under management, all of which were managed on a discretionary basis.

14. Elstun, through CFM, developed a niche serving as an investment adviser to professional athletes. Elstun, who had played college basketball, recruited athletes as advisory clients and managed their money on a discretionary basis. Elstun also managed funds on a discretionary basis for dozens of other retail clients, a handful of companies' 401(k) programs, and a few charitable institutions with endowments.

15. During all relevant times, Elstun was an investment adviser within the meaning of Section 202(a)(11) of the Advisers Act [15 U.S.C. 80b-2(a)(11)], as he owned and controlled CFM and, for compensation through CFM, engaged in the business of advising others as to the value of securities or as to the advisability of investing in, purchasing, or selling securities.

16. Elstun was CFM's majority owner, Investment Manager, and CCO, and served as an IAR to CFM's clients. Elstun managed his clients' advisory accounts on a discretionary basis; he had sole control over the investment decisions for the money his clients entrusted to him. Advisory clients looked exclusively to Elstun to manage their accounts and, pursuant to the

discretionary authority that Elstun's clients granted him, Elstun personally managed the clients' investments in those accounts throughout their relationship.

17.     In exchange for these advisory services, Elstun's clients paid advisory fees to CFM, and Elstun received compensation in connection with those services, including a salary and equity payouts from CFM.

18.     In committing the acts alleged herein, Elstun acted within the course and scope of his employment with CFM. Elstun was solely responsible for managing CFM's relationship with his clients. In committing the violations alleged in this Complaint, Elstun acted for himself and for the benefit of CFM.

19.     As investment advisers, Elstun and CFM are fiduciaries for their advisory clients. As such, Elstun and CFM owe their advisory clients an affirmative duty of utmost good faith, are obligated to provide full and fair disclosure of all material facts, have an affirmative obligation to employ reasonable care to avoid misleading their clients, and have a duty to act in their clients' best interests.

## II.     Elstun Violated his Fiduciary Duties and Defrauded Advisory Clients.

### A.  Elstun Defrauded Advisory Clients by Charging Undisclosed Advisory Fees.

20.     Elstun owed his clients a fiduciary duty to, among other things, act in his clients' best interests and disclose all material facts. In violation of this duty, Elstun charged his clients higher fees than to what they had agreed.

### Elstun Overcharged His Clients.

21.     Elstun and CFM entered into asset management agreements ("Asset Management Agreements") with clients pursuant to which clients agreed to pay CFM a certain percentage of

their assets under management in exchange for investment advisory services. Elstun, in turn, received payments from CFM for providing investment advisory services to clients.

22. Beginning by at least approximately October 2015, CFM, at Elstun's direction, charged four professional athlete advisory clients for which he was CFM's IAR — Clients 1, 2, 3, and 4 — a higher advisory fee percentage than the clients agreed to pay in their Asset Management Agreements.

23. Pursuant to the Asset Management Agreements, these four clients should have been charged a maximum annual fee of 1.00% of assets under management, which would be paid on a quarterly basis. The Asset Management Agreements also contained graduated fee schedules that reduced the 1.00% fee percentage if the value of client assets under management met or exceeded certain thresholds. The Asset Management Agreements further state that they embody all understandings and agreements between the parties, and may only be amended by, and only to the extent evidenced by, a written document executed by both parties.

24. Despite the Asset Management Agreements limiting the annual fee to a maximum of 1.00% of assets under management, by at least approximately October 2015, CFM, at Elstun's direction, began charging each of these four advisory clients an annual fee of 1.25% of their assets under management.

25. One of these four clients, Client 1, had assets under management that, at times, should have been charged fees of less than 1.00% on assets based on the graduated fee schedules in the Asset Management Agreements. Client 1 had two agreements, with each agreement covering different brokerage accounts. One agreement provided that Client 1 would be charged 1.00% on assets up to $1 million, 0.85% on assets from $1 million to $4.5 million, and 0.75% on assets from $4.5 million to $7 million. Client 1's second agreement provided that he would be

7

charged 1.00% on assets up to $2.5 million, 0.85% on assets from $2.5 million to $4.5 million, and 0.75% on assets from $4.5 million to $7 million. From the fourth quarter of 2015 through the third quarter of 2018, Client 1 had assets under management in the brokerage accounts exceeding $4.8 million, and at times assets exceeding $15 million. Contrary to the Asset Management Agreements, CFM, at Elstun's direction, improperly charged Client 1 a 1.25% fee on assets up to $5 million, a 1% fee on assets over $5 million, and a 0.75% fee on assets over $10 million.

26.     Clients 1, 2, 3, and 4 did not agree to pay higher fees than those set forth in their Asset Management Agreements. Elstun and CFM did not disclose to these clients that CFM was charging them a higher fee than they agreed to pay in their Asset Management Agreements.

**Elstun Falsified Documents to Hide His Fraud.**

27.     Elstun directed a member of his CFM staff, in emails dated April 17, 2018, and April 25, 2018, to create new Asset Management Agreements for Clients 1, 3, and 4. The CFM staff member created new Asset Management Agreements for each of these clients that stated that CFM was to be paid fees of 1.25% on assets up to $5 million, 1.00% on assets between $5 million and $10 million, and 0.75% on assets over $10 million. The CFM staff member emailed the new agreements to Elstun on April 25, 2018.

28.     CFM had created signature stamps for Clients 1, 3, and 4, ostensibly to enable CFM to sign documents on these clients' behalf pursuant to their oral authorization. In an email dated April 25, 2018, Elstun directed the CFM staff member to "stamp" the new Asset Management Agreements for Clients 1 and 3 that purported to authorize the 1.25% fee Elstun and CFM had been charging the clients since 2015. Elstun and CFM also caused the new Asset Management Agreement for Client 4 to be "signed" with a signature stamp.

29.     In or about May 2018, CFM produced to the SEC the newly-created Asset Management Agreements for Clients 1, 3, and 4 that purport to authorize the higher fees they had been charging the clients.

30.     Clients 1, 3, and 4 were not aware of the revised 2018 Asset Management Agreements, did not sign or otherwise agree to the revised Asset Management Agreements with the higher 1.25% annual fee, and did not give Elstun or CFM permission to use signature stamps to sign, or otherwise sign, the revised agreements on their behalf.

**Elstun Knowingly, or Recklessly, and Negligently, Overcharged His Clients; the Inflated Fees Were Material to His Clients; Elstun's Conduct Violated His Fiduciary Duties.**

31.     Elstun knew or was reckless in not knowing, and should have known, that he caused Clients 1, 2, 3, and 4 to be overcharged by assessing an annual fee of 1.25% of assets under management when their Asset Management Agreements set the fee at a maximum of 1.00%. Elstun also knew or was reckless in not knowing, and should have known, that he was overcharging Client 1 on the value of assets that exceeded thresholds in the Asset Management Agreements and should have been subject to fees of less than 1.00%. Elstun was responsible for the quarterly billing of these clients and instructed his staff to bill fees that exceeded the fees in the Asset Management Agreements. Further, Elstun directed the fabrication of revised Asset Management Agreements to conceal his misconduct.

32.     Elstun also knew or was reckless in not knowing, and should have known, that he did not disclose to Clients 1, 2, 3, and 4 that CFM, at his direction, was charging fees in excess of what each of these clients agreed.

33.     A reasonable investment adviser would have disclosed to clients the actual fees that were being charged.

34.     As a result of CFM, at Elstun's direction, charging these four clients advisory fees in excess of the percentage to which these clients agreed, these four clients overpaid, and CFM received, at least $173,104 of excess fees from 2015 to 2018. These overcharges were material to Clients 1, 2, 3, and 4 because it improperly increased the fees each paid. Elstun knew or was reckless in not knowing, and should have known, that charging fees in excess of the fees permitted by the Asset Management Agreements with the clients was material to the clients.

35.     Elstun breached his fiduciary duty when he intentionally overcharged these clients.

36.     As CFM's majority owner, Investment Manager, and the IAR for the athlete clients described above, Elstun's knowledge, or recklessness, and negligence, is imputed to CFM. CFM defrauded and breached its fiduciary duty to these clients through Elstun's actions.

**B.    Elstun Defrauded Advisory Clients by Charging Fees to Which Clients Did Not Agree on Non-Advisory Assets.**

37.     Elstun owed his clients a fiduciary duty to, among other things, act in his clients' best interests and disclose all material facts. In violation of this duty, when calculating client fees, which were calculated as a percentage of assets under management, Elstun caused CFM to include assets that were not covered by the Asset Management Agreements.

38.     Elstun defrauded Clients 1, 2, 3, and 5 by causing CFM to charge percentage-based advisory fees on assets that were not covered by the Asset Management Agreements without the clients' agreement or disclosing that CFM was doing so.

39.     The Asset Management Agreements for Clients 1, 2, 3, and 5 stated that the quarterly advisory fee would be charged on "assets under management," and further stated that the fees would be calculated based on the value of the "account" or "Client's Account," referring to the client's advisory account held by a custodian financial institution. Accordingly, "assets

under management" referred only to the assets in the clients' advisory accounts. Assets such as bank accounts, equity in houses and other real estate, and vehicles, were not held in the clients' advisory accounts.

40. Elstun, however, directed CFM staff to include the value of bank account balances, equity in houses and other real estate, and the value of vehicles in the total amount of assets to which CFM applied the advisory fee for these clients. As a result, CFM charged these clients fees to which they did not consent to be charged.

41. For Client 1, from approximately January 2015 to July 2018, Elstun caused CFM to improperly include bank account balances, equity in houses or other real estate, and value of vehicles, in the total amount of assets to which CFM applied the advisory fee.

42. For Client 2, from approximately January 2018 to July 2018, Elstun caused CFM to improperly include equity in houses or other real estate and value of vehicles in the total amount of assets to which CFM applied the advisory fee.

43. For Client 3, from approximately October 2015 to July 2018, Elstun caused CFM to improperly include bank account balances and equity in houses or other real estate in the total amount of assets to which CFM applied the advisory fee.

44. For Client 5, from approximately October 2015 to July 2018, Elstun caused CFM to improperly include bank account balances and equity in houses or other real estate in the total amount of assets to which CFM applied the advisory fee.

45. Elstun's charging of advisory fees on assets not covered by the Asset Management Agreements of Clients 1, 2, 3, and 5, respectively, was contrary to the terms of those agreements.

46.     None of these clients agreed to this practice of charging advisory fees on assets not covered by their respective Asset Management Agreement.

47.     Elstun knew or was reckless in not knowing, and should have known, that he caused CFM to charge these clients advisory fees on assets not covered by the Asset Management Agreements. Elstun was responsible for the quarterly billing of these clients and instructed his staff to bill fees on bank account balances, equity in houses and other real estate, and the value of vehicles.

48.     Elstun also knew or was reckless in not knowing, and should have known, that Clients 1, 2, 3, and 5 did not agree to be charged an advisory fee on assets not covered by their respective Asset Management Agreement.

49.     A reasonable investment adviser would not charge his clients fees to which they had not agreed.

50.     From 2015 through 2018, CFM, at Elstun's direction, overcharged these four clients at least $189,442 in fees on non-advisory assets. These undisclosed, excess fees were material to Clients 1, 2, 3, and 5 because they improperly increased the fees paid by each of them. Elstun knew or was reckless in not knowing, and should have known, that these overcharges were material to these clients.

51.     Elstun breached his fiduciary duty when he intentionally overcharged these clients by including non-advisory assets in the calculation of advisory fees.

52.     As CFM's majority owner, Investment Manager, and the IAR for the athlete clients described above, Elstun's knowledge, or recklessness, and negligence, is imputed to CFM. CFM defrauded and breached its fiduciary duty to these clients through Elstun's actions.

**C. In the Alternative, Elstun Aided and Abetted CFM's Violations of Section 206(1) and 206(2) in Connection with Overcharging Clients and Charging Undisclosed Fees on Non-Advisory Assets.**

53.     As CFM's majority owner, Investment Manager, and the IAR for the athlete clients described above, Elstun's conduct is imputed to CFM. Accordingly, by virtue of the conduct alleged above, CFM violated Sections 206(1) and 206(2) of the Advisers Act.

54.     Elstun, by virtue of the conduct alleged above, knowingly or recklessly substantially assisted CFM's violations of Section 206(1) and Section 206(2).

**D. Elstun Breached His Fiduciary Duty by Failing to Adequately Disclose the Characteristics of Daily Leveraged and Inverse ETF Investments and Making Misrepresentations Regarding his Trading of Client Assets in Those Securities.**

55.     Elstun was obligated to provide full and fair disclosure of all material facts, and had an affirmative obligation to employ reasonable care to avoid misleading his clients. In violation of this duty, Elstun failed to disclose the risks associated with certain securities he purchased on behalf of his clients and made false and misleading statements to his advisory clients about these securities.

**Daily Leveraged and Inverse ETFs**

56.     Between at least March 2013 and the end of 2018, Elstun invested the majority of his advisory clients in certain risky daily leveraged and inverse ETFs, holding these securities for long periods of time, and losing millions of dollars for his clients. During this time period, Elstun made misleading statements to clients about these ETFs, and failed to disclose the risks associated with these ETFs in light of his trading strategy.

57.     An ETF is a type of exchange-traded investment product that often tracks an index, sector, commodity, or other asset, and can be purchased or sold on a stock exchange.

13

58.     Leveraged ETFs are different from, and riskier than, traditional ETFs in that they seek to deliver multiples of the short-term performance (*e.g.*, daily) of the index or benchmark they track. Inverse ETFs, or "short" ETFs, seek to deliver the opposite of the performance of the index or benchmark they track. Some funds are both inverse and leveraged, meaning that they seek to achieve a return that is a multiple of the inverse daily performance of the underlying index or benchmark.

59.     The Financial Industry Regulatory Authority ("FINRA") in a Regulatory Notice published in June 2009, warned that leveraged and inverse ETFs "are highly complex financial instruments that are typically designed to achieve their stated objectives on a daily basis." The FINRA notice goes on to say that such products "are typically unsuitable for retail investors who plan to hold them for longer than one trading session, particularly in volatile markets."

60.     Elstun purchased and held UVXY in most of his client accounts. UVXY is a leveraged ETF that was designed to correspond to two times the daily performance of the S&P 500 VIX Short-Term Futures Index until February 27, 2018, after which it was designed to correspond to one and one-half times the daily performance of the S&P 500 VIX Short-Term Futures Index. Elstun also traded ProShares Short VIX Short-Term Futures ETF (SVXY), which is an inverse ETF that was designed to correspond to one time the inverse of the daily performance of the S&P 500 VIX Short-Term Futures Index until February 27, 2018, after which it was designed to correspond to one-half time the inverse of the daily performance of the S&P 500 VIX Short-Term Futures Index.

61.     The prospectuses for UVXY and SVXY cautioned that they were intended only for sophisticated investors and generally were intended to be used only for short term holdings. For instance, the UVXY prospectus from January 2013 stated: (i) "[UVXY] uses leverage and is

riskier than similarly benchmarked exchange-traded funds that do not use leverage";

(ii) "Shareholders who invest in [UVXY] should actively manage and monitor their investments, as frequently as daily"; (iii) "The use of leveraged positions could result in the total loss of an investor's investment"; (iv) "[UVXY] does not seek to achieve its stated objective over a period greater than a single day"; (v) "Due to the compounding of daily returns, [UVXY's] returns over periods longer than a single day will likely differ in amount and possibly even direction from the two times (2x) the index return for the period"; (vi) "Daily compounding of [UVXY's] investment returns can dramatically and adversely affect its longer-term performance during periods of high volatility"; (vii) "[I]nvestors should not expect [UVXY] to retain any appreciation in value over extended periods of time"; and (viii) "For most investors this likely implies that [UVXY] should only be used as a short-term tactical tool or for diversification purposes rather than an investment in anticipation of long-term gains."

62.     By 2018, the UVXY prospectus also stated that "an investor in any of the funds could potentially lose the full principal value of his/her investment within a single day" and that "[i]nvestors holding Shares of the Funds beyond short-term periods have an increased risk of losing all or a substantial portion of their investment."

**Elstun Engaged in a Buy-and-Hold Strategy for UVXY and SVXY.**

63.     Elstun bought UVXY and SVXY in various client accounts and held the products in the client accounts for months, and in many cases, years.

64.     For example, Elstun made numerous purchases of UVXY and two purchases of SVXY in the accounts of Client 6. Elstun bought and held the vast majority of the UVXY and SVXY purchased in the accounts for at least several months, resulting in total losses exceeding $1.4 million. Of these purchases, Elstun bought approximately $1.17 million of UVXY that he

held in the client's accounts for over a year, resulting in realized and unrealized losses of approximately $1.1 million.

**Elstun Failed to Disclose Material Information to Clients About Leveraged and Inverse ETFs in Light of His Trading Strategy.**

65. Elstun reviewed the ETF prospectuses and should have known that the ETFs are risky investments, that holding the ETFs longer than a single day significantly increased the risk of loss, and that investors should not expect the investments to retain any appreciation in value over extended periods of time.

66. Elstun bought and held UVXY and SVXY in client accounts for extended periods of time and failed to provide full and fair disclosure to advisory clients of material facts regarding the risks and expected returns of the investments in light of this trading strategy. Elstun knew or should have known that he had a duty to disclose such information.

**Elstun Made False and Misleading Statements to His Clients in Light of his Trading Strategy in Leveraged and Inverse ETFs.**

67. Elstun made false and misleading statements to his clients related to the risks of UVXY and the trading strategy he was employing. Elstun characterized his purchase of UVXY to certain clients as "insurance" and a "hedge" when he knew or should have known that he was employing a trading strategy that actually increased the risk of loss to clients. Elstun also misled certain clients by representing he would not buy and hold these instruments when he knew or should have known that he was in fact doing exactly that. Additionally, when CFM's broker terminated its relationship with CFM and Elstun due, at least in part, to his unusual trading in UVXY and SVXY, Elstun made false and misleading statements to his clients and concealed the true reason for the termination.

Elstun's Statements That He Was Using UVXY as Insurance and an Insurance Policy Were False and Misleading.

68.     Despite engaging in a buy-and-hold strategy, Elstun made false and misleading statements to his advisory clients that UVXY functioned like "insurance" or an "insurance policy" against a market downturn. Elstun made, at least, the following false and misleading statements to clients:

    a.    In a March 18, 2015 Investment Strategy PowerPoint presentation that, on information and belief, was given and presented to Client 6 on or about March 18, 2015, Elstun stated, in reference to UVXY, that it is "an 'insurance policy' to an inevitable market downturn;"

    b.    In an April 2, 2015 email from Elstun to Client 7, Elstun stated, in reference to UVXY, that it was "bought as an 'insurance policy' for the upcoming downturn/potential collapse in the market;"

    c.    In a May 6, 2015 email from Elstun to Client 8, Elstun stated, in reference to UVXY, that it is "an 'insurance policy' to an inevitable market downturn;"

    d.    In a June 18, 2015 Investment Strategy PowerPoint presentation that, on information and belief, was given and presented to Client 6 on or about June 18, 2015, Elstun stated, in reference to UVXY, that it is "an 'insurance policy' to an inevitable downturn" and "[i]nsurance against a rise in interest rates;"

    e.    In a December 16, 2015 Investment Strategy PowerPoint presentation that, on information and belief, was given and presented to Client 6 on or about December 16, 2015, Elstun stated, in reference to UVXY, that it is "an 'insurance policy' to an inevitable market downturn and rate rise;"

    f.    In a December 24, 2015 email from Elstun to Client 9, attaching a December 24, 2015 Investment Strategy PowerPoint presentation, Elstun stated, in reference to UVXY, that it is "an 'insurance policy' to an inevitable market downturn and rate rise;"

    g.    In a May 23, 2016 email from Elstun to Client 10, attaching a May 2016 VIX Strategy PowerPoint presentation, Elstun stated, in reference to UVXY, that it is "an 'insurance policy' to a market downturn and rate rise;"

    h.    In a June 28, 2016 email from Elstun to Client 6, attaching a June 22, 2016 PowerPoint presentation, Elstun stated, in reference to the client's investment in UVXY, that it is "an 'insurance policy' to a market downturn and rate rise;"

i.      In a July 20, 2016 Investment Update PowerPoint presentation that, on information and belief, was given and presented to Client 10 on or about July 20, 2016, Elstun stated, in reference to UVXY, that he would "[u]se 'insurance' to offset losses of panic selling;"

j.      In a September 20, 2016 Investment Update PowerPoint presentation that, on information and belief, was given and presented to Client 11 on or about September 20, 2016, Elstun stated that he would "[u]se 'insurance' to offset losses of panic selling" and in reference to UVXY that it is "an 'insurance policy' to a market downturn and rate rise;"

k.      In a September 21, 2016 PowerPoint presentation that, on information and belief, was given and presented to Client 6 on or about September 19, 2016, Elstun stated, in reference to UVXY, that he would "[u]se 'insurance' to offset losses of panic selling;"

l.      In a November 8, 2016 email from Elstun to Client 12, attaching a November 2016 Investment Update PowerPoint presentation, Elstun stated he would "[u]se 'insurance' to offset losses of panic selling" and, in reference to UVXY, that it is "an 'insurance policy' to a market downturn and rate rise;"

m.      In a November 8, 2016 Investment Update PowerPoint presentation that, on information and belief, was given and presented to Client 13 on or about November 8, 2016, Elstun stated, in reference to UVXY, that it is "an 'insurance policy' to a market downturn and rate rise;"

n.      In a December 9, 2016 email from Elstun to Client 14, attaching a December 9, 2016 Investment Update PowerPoint presentation, Elstun stated, in reference to UVXY, that he would he would "[u]se 'insurance' to offset losses of panic selling;"

o.      In a December 21, 2016 PowerPoint presentation that, on information and belief, was given and presented to Client 6 on or about December 21, 2016, Elstun stated, in reference to UVXY, that he would "[u]se 'insurance' to offset losses of panic selling;"

p.      In a December 23, 2016 email from Elstun to Client 9, attaching a December 15, 2016 PowerPoint presentation, Elstun stated, in reference to UVXY, that he would "[u]se 'insurance' to offset losses of panic selling;" and

q.      In a May 3, 2017 email from Elstun to Client 15, Elstun stated, in reference to UVXY, that it "can very easily be justified as a buy to be utilized as 'insurance' like much of the other smart money plays we read about daily."

69.     Elstun's statements above were false and misleading, violated his fiduciary duty, and did not comply with the standard of care he owed to his clients because his buy-and-hold investment strategy for trading UVXY did not act as insurance and increased the clients' risk of loss, as opposed to mitigating risk.

70.     When Elstun made statements to clients characterizing holding UVXY as similar to "insurance" and an "insurance policy," he failed to disclose additional information, such as the risks of buying and holding UVXY beyond a short period and that investors should not anticipate long terms gains from holding UVXY, necessary to render those statements not misleading.

<u>Elstun's Statements that UVXY Was a Hedge Were False and Misleading.</u>

71.     Elstun's buy-and-hold strategy was inconsistent with the risks outlined in the prospectus, which cautioned, for example, that "[UVXY] does not seek to achieve its stated objective over a period greater than a single day" and "investors should not expect [UVXY] to retain any appreciation in value over extended periods of time." Elstun's buy-and-hold strategy created additional risks for clients. Despite his trading strategy increasing the risk of loss to clients, Elstun made false and misleading statements to his advisory clients that UVXY was a "hedge" against lower stock prices. Elstun made at least the following false and misleading statements to clients:

     a.    In an October 3, 2013 email from Elstun to Client 7, Elstun stated, in reference to UVXY, that it is "a hedge to a market downturn;"

     b.    In an October 9, 2014 email from Elstun to Clients 16 and 17, Elstun stated, in reference to UVXY, that it is "often used to hedge stock investments because of the way it tends to rise as stocks fall, and vice versa;"

     c.    In a November 4, 2014 email from Elstun to Client 7, Elstun stated, in reference to UVXY, that it "is a hedge to a market downturn that we just witnessed from September 18 to October 16" and "was originally purchased as a hedge to a market in complete uncertainty with the Fed unprecedented actions with no blueprint in history;"

d. In a November 7, 2014 email from Elstun to Client 18, Elstun asked Client 18: "Please really think about this one as a hedge to the next upcoming market downturn" and stated in reference to UVXY that it is "a buy again to hedge the next downturn or the correction we've been scared of;"

e. In a December 12, 2014 email from Elstun to Client 19, Elstun stated: "While the market has been dropping, [UVXY] has been our hedge to that fear;"

f. In a December 13, 2014 email from Elstun to Client 19, attaching a December 15, 2014 Investment Strategy PowerPoint presentation, Elstun stated, in reference to UVXY, that it "is another hedge to stock market volatility and downturn;"

g. In a January 8, 2015 email from Elstun to Client 9, attaching a January 7, 2015 Investment Update PowerPoint presentation, Elstun stated, in reference to UVXY, that it is "another hedge to stock market volatility and downturn" and "[t]his investment was originally purchased as a hedge to a market in complete uncertainty with the Fed unprecedented actions add [sic] no blueprint in history;"

h. In a January 27, 2015 email from Elstun to Client 20, Elstun stated, in reference to UVXY, that it is "definitely a hedge and a way to make money while the market declines which is also well overdue;"

i. In a March 18, 2015 Investment Strategy PowerPoint presentation that, on information and belief, was given and presented to Client 6 on or about March 18, 2015, Elstun stated, in reference to UVXY, that it is "another hedge to stock market volatility;" and

j. In a July 20, 2017 email from Elstun to Client 21, Elstun stated, in reference to UVXY, that it is "a hedge on the extreme overvaluation in the market that will eventually give way."

72. Elstun's statements above were false and misleading, violated his fiduciary duty, and did not comply with the standard of care he owed to his clients because, while if traded on a daily or other short-term basis, UVXY might be considered a "hedge," Elstun's buying and holding of UVXY for months and years in client accounts actually increased the risk of loss to clients, as opposed to reducing risk as a "hedge" typically would.

73. When Elstun made statements to clients characterizing holding UVXY as a "hedge," he failed to disclose additional information, such as the risks of buying and holding

UVXY beyond a short term period and that investors should not anticipate long terms gains from holding UVXY, necessary to render those statements not misleading.

> Elstun's Statements That He Was Not Using a Buy-and-Hold Strategy Were False and Misleading.

74.     Elstun made false and misleading statements to his advisory clients that he was using UVXY tactically in their advisory accounts at certain points in time and was not buying and holding UVXY. Elstun made, at least, the following false and misleading statements to clients:

      a.    In a March 9, 2015 email from Elstun to Client 18, Elstun stated, in reference to UVXY, that it is "not a long-term investment, and we have not held it for long either;"

      b.    In an April 7, 2015 email from Elstun to Client 18, Elstun stated, in reference to UVXY, that it is "short term to serve a purpose;"

      c.    In a June 18, 2015 Investment Strategy PowerPoint presentation that, on information and belief, was given and presented to Client 6 on or about June 18, 2015, Elstun stated, in reference to UVXY, that it is to be "[u]sed tactically at certain points in time.  Not used to buy and hold;"

      d.    In a September 15, 2015 email from Elstun to Client 6, attaching a September 16, 2015 PowerPoint presentation, Elstun stated about the VIX, in reference to the client's investment in UVXY, that it is to be "[u]sed tactically at certain points in time.  Not used to buy and hold;"

      e.    In a December 16, 2015 Investment Strategy PowerPoint presentation that, on information and belief, was given and presented to Client 6 on or about December 16, 2015, Elstun stated, in reference to UVXY, that it is to be "[u]sed tactically at certain points in time.  Not used to buy and hold;"

      f.    In a December 24, 2015 email from Elstun to Client 9, attaching a December 24, 2015 Investment Strategy PowerPoint presentation, Elstun stated, in reference to UVXY, that it is to be "[u]sed tactically at certain points in time and not to buy and hold;"

      g.    In a May 23, 2016 email from Elstun to Client 10, attaching a May 2016 VIX Strategy PowerPoint presentation, Elstun stated, in reference to UVXY, that it is to be "[u]sed tactically at certain points in time and not to buy and hold;"

h.  In a June 28, 2016 email from Elstun to Client 6, attaching a June 22, 2016 PowerPoint presentation, Elstun stated about the VIX, in reference to the client's investment in UVXY, that it is to be "[u]sed tactically at certain points in time.  Not used to buy and hold;"

i.  In a July 20, 2016 Investment Update PowerPoint presentation that, on information and belief, was given and presented to Client 10 on or about July 20, 2016, Elstun stated, in reference to UVXY, that it is to be "[u]sed tactically at certain points in time and not to buy and hold;"

j.  In a September 20, 2016 Investment Update PowerPoint presentation that, on information and belief, was given and presented to Client 11 on or about September 20, 2016, Elstun stated, in reference to UVXY, that it is to be "[u]sed tactically at certain points in time and not to buy and hold;"

k.  In a November 8, 2016 email from Elstun to Client 12, attaching a November 2016 Investment Update PowerPoint presentation, Elstun stated, in reference to UVXY, that it is to be "[u]sed tactically at certain points in time and not to buy and hold;" and

l.  In a November 8, 2016 Investment Update PowerPoint presentation that, on information and belief, was given and presented to Client 13 on or about November 8, 2016, Elstun stated, in reference to UVXY, that it is to be "[u]sed tactically at certain points in time and not to buy and hold."

75.  Elstun's statements above were false and misleading, violated his fiduciary duty, and did not comply with the standard of care he owed to his clients because in actuality, Elstun did not use the products tactically at certain points in time, but instead, did the exact opposite, holding UVXY in client accounts for months and in many cases, years.

76.  When Elstun made these statements to clients, he failed to disclose additional information, such as his true trading strategy, which involved buying and holding UVXY contrary to the recommended use of the product, necessary to render those statements not misleading.

Elstun's Response to Client Questions About UVXY Continued to Defraud Clients.

77.  When questioned by advisory clients about their UVXY holdings and, in most instances, significant losses, Elstun continued to mislead them. Elstun claimed that his clients'

investments in UVXY would be profitable if they continued to hold the investments, without

disclosing that they should not expect UVXY to retain any appreciation in value over extended

periods of time, and without disclosing the real risks of buying and holding the investment long

term. Elstun made, at least, the following false and misleading statements to clients:

a. In October 23, 2013 emails between Elstun and Client 7, Client 7 questioned Elstun's buy and hold strategy related to UVXY and Elstun responded: "Since the markets are not behaving normally due to the Fed's artificial propping of valuations, this holding cannot truly take hold until the Fed tapers. We thought that would be last month, but now it will be longer. Once the Fed gets out of our way, this market will go to a true valuation in due time. Since the market is driven higher by wider profits, we are beginning to see a drastic disconnect between the market and earnings with the decrease in earnings" and "[w]hile this holding has dropping with the Fed artificially propping the market up, it will pop again in a big way;"

b. In a July 24, 2014 email from Elstun to Client 14, Elstun stated that he would "[m]onitor our potential future 'best friend', UVXY, for the best entry point. Currently, this is our worst performer, but when volatility [sic] actually enters the market, we will more than likely love this guy;"

c. In October 7, 2014 emails between Elstun and Client 16, Client 16 commented about UVXY's performance and Elstun responded that "[y]ou'll be very happy with UVXY inside of 1 year and might be our best ever" and "[w]e are in a solid position right now with the market downturn and Fed exit this month;"

d. In October 14, 2014 emails between Elstun and Client 17, Client 17 asked whether his UVXY holdings were sold and Elstun responded "I still firmly believe this will get real interesting in November at some point when the Fed is out. Until then, we will have our chances to get back in lower and probably below 30. This is when I'd like to get more for you;"

e. In December 12, 2014 emails between Elstun and Client 17, Client 17 told Elstun that someone else had questioned who would trade in such a risky stock as UVXY and Elstun responded it was a "no brainer layup. We'll be just fine on this one;"

f. In a December 13, 2014 email from Elstun to Client 19, attaching a December 15, 2014 Investment Strategy PowerPoint presentation, Elstun stated, in reference to UVXY: "We have been ready for this downturn with our VIX allocation. This allocation has allowed us to absorb a stock

downturn and preserve our stock allocation. We should continue to outperform the market on the way down;"

g.     In January 6, 2015 emails between Elstun and Client 7, Elstun commented on UVXY that the "challenge with this one is not selling too soon. I'm not concerned about us making money on it but losing opportunity;"

h.     In February 2, 2015 emails between Elstun and Client 22, Elstun stated: "In regards to UVXY, we are going to sell profits only at 34 and let the original investment ride. We have had a good run and have had a tremendous profit. The goal is to potentially buy gains only back at $23.50 or lower and take advantage of this volatility we knew was coming in the market;"

i.     In February 24, 2015 emails between Elstun and Client 11, Client 11 questioned the UVXY losses and Elstun responded that "[n]ot sure if we're down that much, but it is definitely time to buy this one. Take a peak [sic] at its chart the look at the S&P 500 chart. Compare their performance to what happened from September to October of last year. That 94% gain could easily repeat itself. The VIX is a fear index and will rise as the market declines. This could be our best friend real soon;"

j.     In March 9, 2015 emails between Elstun and Client 18, Client 18 said she is not happy with UVXY and Elstun responded that "[i]t is easy to kick the UVXY dog while it's down and to poke holes in right now when it is the ugliest. Some do and end their patience with it. However, the true purpose of the investment has not kicked in yet and will make you look good in the end;"

k.     In April 2, 2015 emails between Elstun and Client 7, Client 7 asked Elstun to sell his UVXY holdings and Elstun responded: "It has proven to do extremely well during those times and not well during a market increase. As we know, it is at its ugliest right now which is actually the time to buy….We are just beginning to see volatility and have not seen a true downturn. I am still confident in its purpose during a correction;"

l.     In April 9, 2015 emails between Elstun and Client 17, Client 17 questioned why UVXY goes down when the market goes either up or down and Elstun responded "I'm in constant contact with the company and Wall Street traders who are all in this as well. We all know this market is artificial right now, and it is a matter of time. It just sucks in the meantime, and I hate it too. In the big scheme, we have bought cheap and will get out with good gains;"

m.     In May 8, 2015 emails between Elstun and Client 8, Client 8 asked about his UVXY unrealized losses and Elstun responded: "Since it does

extremely well during downturns in the market and we are expecting an overdue correction of 10+%, we should get the profits we expect to sell out with good gains….we have not sold to realize [the losses] and expect to come out of this in good shape while creating buying opportunities when that time comes" and "[w]e'll make money in UV and be able to buy cheaper in the market. The 7.4% decline in Sept/Oct shot it up 94%. We still haven't seen the 10% correction or worse many are calling for. Your overall return on your portfolio is not far off at all, and we have actually sold profits at the end of March. Once this decline hits, it all works;"

n.     In May 20, 2015 emails between Elstun and Client 23, in response to Client 23's statement that they should sell UVXY, Elstun responded: "It has definitely been painful and testing our patience daily at this point, but we will be rewarded. The market has again overshot on the high side and is becoming more overvalued weekly. It is trading on interest rate predictions and not fundamentals of the market and economy making the downturn even bigger. I'm reading more negative news daily and still feel that we will make good money on this….On the other side, we will be taking more profits again next week. Since the stock market and UV are non correlating [sic], we will not win at both at the same time. It will all come together once the market drops…Your patience is definitely appreciated, but we are not as far off as it seems;"

o.     In May 12, 2016 emails between Elstun and Client 17, in response to Client 17's statement that he is angry that Elstun will not admit that trading in UVXY was a mistake, Elstun responded that "I know I've said for a while that UV has not played out yet. It will do so when the market finally readjusts, which could be closer to election time at this point. It cannot play out when the market is so close to all-time highs and is a hedge in a losing market as seen earlier this year. The earlier downturn will be small in comparison to what is potentially going to happen. Who knows, but a market cannot go on forever at this rate and has gone nowhere since 2014;"

p.     In August 17, 2016 emails between Elstun and Client 11, Client 11 questioned the large UVXY losses and Elstun responded: "There is definitely a deep thought process behind it that will not take shape until this overvalued market decidedly goes down. I will explain in detail with expectations;"

q.     In November 9, 2016 emails between Elstun and Client 24, Elstun stated, in reference to UVXY: "We have 1 investment that has hurt us when the market either goes sideways or up that will make us money when the market drops. We are also sitting on approximately 50% of your portfolio in cash to buy cheaper. Ultimately, we want this market to crash and burn to buy cheaper down the road to make good money;"

r.    In May 3, 2017 emails between Elstun and Client 15, Client 15 asked Elstun to return his fee due to his losses in UVXY, and Elstun responded: "The VIX investment you mention and have held for only 52 days is now at 10-year lows. The obvious math relates that time back to 2007 before the crash and can very easily be justified as a buy to be utilized as "insurance" like much of the other smart money plays we read about daily….When the market environment goes awry, it has proven to do very well in a short period of time. From April 5th–13th, the VIX shot up 26% and coincided with the S&P 500 that had a relatively minor decline of 1.2%. Our holding increased by 38% during the same time. The sudden jump of the VIX during a placid market would seem to indicate an expectation of sharply higher volatility to happen soon;" and

s.    In August 15, 2017 emails between Elstun and Client 14, Client 14 asked for an update on UVXY and Elstun responded: "It is past frustrating but showing life lately which is what we need to see. It is just unreal that there is real potential conflict, economic issues, QE being pulled out in September and well-respected businessmen pulling out of Trump's manufacturing council, but the market remains calm or goes up."

78.    Elstun's statements above were false and misleading, violated his fiduciary duty, and did not comply with the standard of care he owed to his clients because Elstun had no reasonable basis to believe that UVXY would be profitable if clients continued to hold the investment and his statements minimized the risk of continuing to hold the leveraged and/or inverse ETFs and the unrealized losses on the investments.

79.    When Elstun made these statements to clients, he failed to disclose additional material information, such as the risks and expected returns of buying and holding UVXY long term explained in its prospectuses, necessary to render those statements not misleading.

<u>Elstun's Statements About CFM's Brokerage Cancellation Were False and Misleading.</u>

80.    In October 2018, CFM's and Elstun's custodial brokerage terminated its agreement with CFM, stating it would no longer honor any authorizations held by CFM and Elstun "due in part to concerns with trading activity by Crossroads." Elstun communicated with the brokerage and understood the relationship was being terminated due, at least in part, to his

trading practices relating to leveraged and/or inverse ETFs. As a result, CFM changed the brokerage it used in approximately January 2019.

81.    Elstun sent an email to his clients in October 2018 that contained false and misleading statements regarding his reasons for changing the brokerage CFM used. Elstun stated in the email, "In a decision to strengthen our infrastructure, we have decided to move custodians from [the brokerage] to another highly respected custodian…." Elstun also stated, "[a]fter numerous attempts over the past few years with [the brokerage] to ensure better communication, compliance, fee structure, and accountability, we felt that we had settled for mediocre service, which is not good enough. We have agreed upon the 90-day period to change custodians to bolster our service and offerings that you deserve." Elstun further stated, "[p]lease do not be surprised if a member of [the brokerage] reaches out to you making a case for you to keep your assets where they are. It is in THEIR best interests to keep your investments under their management, not yours. This competition is another reason for our change."

82.    Elstun's statements above were false and misleading, violated his fiduciary duty, and did not comply with the standard of care he owed to his clients because he stated that CFM decided to change its brokerage due to poor service and other reasons, when in fact the brokerage had refused to continue its relationship with CFM due, at least in part, to Elstun's ETF trading.

83.    When Elstun made these statements to clients, he failed to disclose additional information, such as that it was his unusual ETF trading that had resulted in the brokerage being unwilling to continue its relationship with CFM, necessary to render those statements not misleading.

Elstun Made Similar Oral Misrepresentations.

84.    Elstun communicated with clients over the telephone and in person and, upon information and belief, from 2013 to 2018, Elstun also made the same or similar misstatements

as set out above in Paragraphs 68, 71, 74, and 77, orally in meetings and/or telephone calls with clients for whom Elstun traded these leveraged and inverse ETFs.

<u>These Statements Were Material and Made Negligently.</u>

85.    The false and misleading statements and omissions outlined above were material because it would have been important to a reasonable client to know that Elstun had no reasonable basis to believe that his buy-and-hold strategy would be profitable, particularly in light of the risks identified in the prospectuses, and that Elstun's strategy actually increased the risk of loss to clients, as opposed to acting as an "insurance policy" or a "hedge" to a market downturn, especially in light of the large losses that most of Elstun's clients incurred when he held the investments for months or years. The clients identified above as receiving the false statements about UVXY had approximately $4.8 million in realized and unrealized losses from ETF trading.

86.    Elstun knew or should have known that he had a duty to not make misleading statements of material fact. In making these statements, Elstun was at least negligent. Elstun failed to use ordinary care under the circumstances and failed to exercise the care a reasonable investment adviser would use in making disclosures to clients about his trading in ETFs and the products' risks.

87.    In particular, Elstun mischaracterized his purchase of the daily leveraged and inverse ETFs to certain advisory clients as an "insurance policy" and a "hedge" against lower stock prices when he knew or should have known (and did not disclose) that he was employing a trading strategy that was inconsistent with the products' intended use and actually increased the risk of loss to clients. Elstun also misled certain clients by representing he would not buy and hold these instruments when he knew or should have known that this is exactly what he was doing. Elstun additionally misled clients by claiming that it was CFM's decision to terminate its

relationship with the brokerage firm holding client accounts, when he knew or should have known that the brokerage firm terminated the relationship based, at least in part, on his trading in leveraged and inverse ETFs in client accounts. A reasonable investment adviser would have taken steps to ensure that statements made about ETFs to clients were accurate and not misleading.

88.     Elstun breached his fiduciary duty when he negligently made material misrepresentations and omissions to these clients about the leveraged and/or inverse ETFs and his trading of the ETFs in client accounts.

### E.     Elstun Breached his Fiduciary Duty by Making Unsuitable Investments in Leveraged and Inverse ETFs that Resulted in Substantial Losses.

89.     Elstun owed his clients a fiduciary duty to, among other things, act in his clients' best interests. This duty included an obligation to manage their money in a manner consistent with their risk tolerances and investment objectives. In violation of this duty, Elstun invested clients in leveraged and inverse ETFs using his buy-and hold strategy despite the clients having investment objectives or risk tolerances that were inconsistent with investing in the risky and volatile leveraged and inverse ETFs. Despite his fiduciary obligation, Elstun made investments that were not suitable for those clients.

**Elstun Invested Clients with a Stated Conservative Risk Tolerance in Risky Leveraged and Inverse ETFs.**

90.     Elstun did not document the investment objective or risk tolerance information that he received from the vast majority of his clients. Of the handful of clients for whom Elstun did have documents setting forth investment objectives and risk tolerances, at least five of those clients had listed investment objectives and risk tolerances that were inconsistent with Elstun's unsuitable and risky investments in the leveraged and/or inverse ETFs.

91.     Client 1's Financial Management Checklist stated that Elstun was to "[a]bide by conservative/strategic asset allocation." As a result, trading in leveraged and inverse ETFs was inconsistent with Client 1's conservative risk tolerance. Nonetheless, Elstun invested Client 1 in UVXY and SVXY. This included holding UVXY and SVXY for long periods of time, in some instances for well over a year, leading to approximately $785,000 in losses.

92.     Client 5's Investment Statement Policy listed his overall risk tolerance and tolerance for long and short-term volatility as "moderate." As a result, trading in leveraged and inverse ETFs was inconsistent with Client 5's moderate risk tolerance. Nonetheless, Elstun invested Client 5 in UVXY. This included holding UVXY for long periods, in some instances for years, leading to approximately $538,000 in losses.

93.     Client 6 had multiple accounts with different investment objectives. The Investment Statement Policy for one of the accounts listed the investment objective as "'Income Producing', which means that the portfolio will be invested for long-term income using generally income-producing investments with a secondary goal of using fixed income to provide diversification and a base level of current income." The Investment Statement Policy for another account listed the investment objective as "'Competitive Risk,' which means that the portfolio will be invested for long-term growth of capital using equity investments with a secondary goal of using fixed income to provide diversification and a base level of current income." As a result, trading in the leveraged and inverse ETFs was inconsistent with Client 6's investment objectives and stated products for both of these accounts. Nonetheless, Elstun invested Client 6 in UVXY and SVXY. This included holding UVXY and SVXY for long periods of time, in some instances for well over a year, leading to approximately $1.4 million in losses.

94.     Client 18's Investment Statement Policy listed the investment objective as "'Competitive Risk,' which means that the portfolio will be invested for long-term growth of capital using equity investments with a secondary goal of using fixed income to provide diversification and a base level of current income." As a result, trading in the leveraged and inverse ETFs was inconsistent with Client 18's investment objective and stated products. Nonetheless, Elstun invested Client 18 in UVXY. This included holding UVXY for more than three years, leading to over $45,000 in losses.

95.     Client 24's risk tolerance was listed as "moderate" in a CFM client spreadsheet. As a result, trading in the leveraged and inverse ETFs was inconsistent with Client 24's moderate risk tolerance. Nonetheless, Elstun invested Client 24 in UVXY. This included holding UVXY for long periods of time, in some instances more than one year, leading to approximately $175,000 in losses.

96.     On information and belief, Elstun made additional unsuitable investments in leveraged and/or inverse ETFs on behalf of clients who orally conveyed to Elstun risk tolerances and investment objectives that were inconsistent with his trading and holding the ETFs in their accounts.

**Elstun Also Made Unsuitable Investments in Risky Leveraged and Inverse ETFs for Clients Nearing or In Retirement.**

97.     Given the products' risky nature, Elstun understood that leveraged or inverse ETFs were not suitable for clients who were nearing or in retirement. Despite his understanding, Elstun invested at least seven clients who were 65 years or older in UVXY and/or SVXY. Elstun knew or should have known that leveraged and inverse ETFs were not suitable for those clients, especially in light of his buy-and-hold strategy. These seven clients who were 65 years or older

(Clients 25, 26, 27, 28, 29, 30 and 31) lost approximately $255,000 investing in the leveraged and/or inverse ETFs.

**Elstun's Unsuitable Investments Were Material and Negligent.**

98.     Elstun's unsuitable investments in leveraged and inverse ETFs, which resulted in substantial losses to clients, would have been important to a reasonable investor because a reasonable investor would want to know that Elstun was not investing their funds in accordance with their risk tolerance or investment objectives.

99.     Elstun acted negligently by investing certain clients in leveraged and inverse ETFs even though their documented risk tolerances and investment objectives, especially combined with Elstun's investing in these ETFs on a buy-and-hold basis, made the investment unsuitable for those clients. Further, Elstun knew or should have known that leveraged and inverse ETFs were unsuitable for his clients who were nearing or in retirement, given their risky nature. A reasonable investment adviser would have made suitable investments for clients.

100.     Elstun breached his fiduciary duty when he made unsuitable investments for these clients in the leveraged and inverse ETFs.

## III.     Elstun Aided and Abetted CFM's Violations of the Custody Provisions of the Advisers Act.

101.     Rule 206(4)-2 under the Advisers Act specifies that it is "a fraudulent, deceptive, or manipulative act, practice or course of business" for a registered adviser to have custody of client funds or securities unless the adviser complies with certain specified requirements intended to protect client assets from being lost, misused, misappropriated, or becoming subject to the adviser's financial reverses (the "Custody Rule").

102.     The Custody Rule provides that an adviser has custody of client assets if it holds, directly or indirectly, client funds or securities, or if it has the authority to obtain possession of

those assets, including the capacity that gives the adviser legal ownership of, or access to, client funds or securities and any arrangement (including a general power of attorney) under which the investment adviser is authorized or permitted to withdraw client funds or securities maintained with a custodian upon instruction to the custodian. An adviser that has custody must, among other things (1) have a reasonable basis for believing that a qualified custodian sends account statements at least quarterly to clients; and (2) ensure that client funds and securities are verified by actual examination each year by an independent public accountant at a time chosen by the accountant without prior notice or announcement to the adviser.

103.    From 2015 through 2018, CFM had custody of client assets in brokerage accounts due to the provision in client Asset Management Agreements giving CFM the authority to withdraw its quarterly fees from the client brokerage accounts. Specifically, the Asset Management Agreements allowed CFM to calculate each client's quarterly investment adviser fee and then transfer those fees directly to CFM from each client's brokerage account.

104.    Additionally, CFM had custody of certain athlete client bank accounts since it had online login information for these bank accounts so that it could pay those professional athlete clients' ongoing bills.

105.    CFM also had custody of client assets because it had signature stamps for certain clients for, among other things, withdrawing funds from their brokerage accounts.

106.    With respect to both the brokerage and bank accounts for at least six professional athlete clients, CFM was the sole designated recipient of statements, and no one at CFM forwarded a copy of these statements to the professional athlete clients.

107.    Despite having custody of some advisory client assets, CFM did not engage any public accountant to conduct annual surprise examinations of either the brokerage or bank account assets.

108.    As CFM's majority owner and Investment Manager, from 2015 to 2018, Elstun knowingly or recklessly substantially assisted CFM's violations of the Custody Rule by: (i) directing CFM's transfer of fees from clients' brokerage accounts and the firm's use of log-in authority for certain professional athlete clients' bank accounts to enable bill-paying; (ii) not taking reasonable steps to ensure delivery of account statements to the clients, despite CFM's belated adoption of a policies and procedures manual in April 2018 that called for CFM to do so; and (iii) failing to cause CFM to retain an independent public accountant to verify client funds.

## IV.    Elstun Aided and Abetted CFM's Violations of the Cash Solicitation Rule.

109.    During the relevant period, Advisers Act Section 206(4) and Rule 206(4)-3 thereunder prohibit a registered investment adviser, such as CFM, from paying a cash fee to anyone for soliciting clients for the investment adviser unless there is a written agreement between the solicitor and the investment adviser ("the solicitor agreement") that (a) describes the solicitation activities to be engaged in by the solicitor on behalf of the investment adviser and the compensation to be received for such activities; (b) contains an undertaking by the solicitor to perform his duties under the agreement in a manner consistent with the instructions of the investment adviser and the Advisers Act; and (c) requires the solicitor, at the time of the solicitation of the client, to provide the client with a current copy of the investment adviser's brochure and a separate written disclosure statement (the "Cash Solicitation Rule"). Additionally, the Cash Solicitation Rule requires that the investment adviser must receive from the client prior to, or at the time of, entering into any written or oral investment advisory contract

with such client, a signed and dated acknowledgment of receipt of the investment adviser's written disclosure and the solicitor's written disclosure statements.

110. CFM paid on-going referral fees to five individuals for their referral of advisory clients to Elstun. CFM paid each of the solicitors a percentage of the fees collected from those clients on a quarterly basis, totaling approximately $264,000 of payments from July 2012 through October 2018.

111. Two of these individuals, however, did not have written contracts with CFM covering their solicitation activities. For two of the solicitors that had written agreements with CFM, the written agreements failed to include an undertaking by the solicitor to perform duties consistent with CFM's instructions and the Advisers Act, nor did they contain a requirement for the solicitor to furnish the client with CFM's brochure and a separate written disclosure document.

112. For at least eight of the nine advisory clients that were referred to CFM by solicitors, Elstun failed to obtain a written acknowledgement from the client of receipt of CFM's brochure and the solicitor's disclosure. Elstun did not tell at least seven of the nine clients that the individuals who referred them to CFM would receive referral fees and did not know whether the solicitors had informed any of the clients (and so provided the necessary disclosures).

113. Elstun worked directly with each of the solicitors, and directed and approved payments CFM made to each of them. Further, as CFM's majority owner and Investment Manager, Elstun was responsible for maintaining written solicitor agreements, verifying that written solicitor agreements contained the required undertakings to perform the solicitor's duties consistent with the instructions of CFM and the Advisers Act, and obtaining acknowledgements

of the solicitation arrangement by CFM's clients. Elstun knowingly or recklessly substantially

assisted CFM's violations of the Cash Solicitation Rule as a result.

## V.    Elstun Aided and Abetted CFM's Failure to Adopt and Implement Written Policies and Procedures Reasonably Designed to Prevent Violations of the Advisers Act and Rules Thereunder.

114.    Section 206(4) of the Advisers Act and Rule 206(4)-7 thereunder require

registered investment advisers to adopt and implement written policies and procedures

reasonably designed to prevent violations of the Advisers Act and the rules thereunder.

115.    Prior to April 2018, CFM did not adopt or implement any written compliance

policies and procedures.

116.    In or about April 2018, CFM adopted written policies and procedures (the

"manual"), but those policies and procedures were insufficient because CFM failed to adopt or

implement policies and procedures reasonably designed to prevent violations of the Advisers Act

and rules thereunder relating to advisory fees, inverse and leveraged ETFs, suitability, custody,

and solicitation.

117.    Despite Elstun investing the majority of his clients in leveraged and/or inverse

ETFs, CFM failed to adopt any policies relating to inverse and leveraged ETFs, including

policies about the purchase, sale, and disclosures related to the products.

118.    CFM's April 2018 manual provided: (1) the client Asset Management Agreement

"must clearly detail the service(s) to be provided and the fee(s) that will be charged to the Client

in addition to any other material information that is appropriate for inclusion in a client

agreement" and "should, among other things describe the Adviser's services and fee schedules;"

and (2) advisory representatives are required to "ensure that Advisory Clients have been

provided with sufficient disclosure to understand the fees associated with their account." These

written policies and procedures were not implemented in connection with all advisory client

billing. Further, CFM did not have any policies and procedures relating to ensuring that fees were charged consistent with the client Asset Management Agreements.

119. CFM's April 2018 manual stated: "The advisory contract should include…client investment objectives." Elstun, however, failed to include this information in any client agreements, and out of approximately 270 clients, Elstun obtained and documented client objectives and risk tolerance for only a handful of clients. The manual also requires that "[e]ach client portfolio should remain invested in accordance with the client's investment policy statement (or similar document)." However, Elstun failed to prepare and maintain such documentation for the majority of his clients. Further, Elstun ignored documented risk tolerances and risk tolerances based on clients' ages and whether they were in or nearing retirement, as set forth above.

120. CFM's April 2018 manual stated: "CFM will make a reasonable effort to ensure that the qualified custodian being used will deliver quarterly account statements to the client showing transactions for that time period." CFM did not implement this policy. CFM did not include in its policies and procedures a requirement of surprise annual exam by a public accountant for the assets over which CFM had custody.

121. CFM's April 2018 manual required that CFM have an agreement with any person soliciting investors "detailing term, payments, marketing activities, and disclosures." It further provided: "CFM will create a solicitor's disclosure document" and stated that any such solicitor will provide the disclosure to the potential client and obtain a signed acknowledgement from the potential client. As set out above, CFM did not have written agreements with some of the solicitors, some of the written agreements did not contain the necessary information, and acknowledgements were not obtained from all but one of the potential clients.

122. CFM therefore failed to adopt necessary policies and to implement policies relating to the need to clearly detail the fees that clients would be charged, client objectives and client suitability, custody, and solicitation. Despite the existence of policies and procedures related to these topics and contrary to specific requirements within these policies and procedures, CFM failed to, among other things, adequately disclose the fees it charged, failed to include investment objective information in any client agreements, did not make reasonable efforts to deliver quarterly statements to investors, and did not have written agreements with some of the solicitors or procedures to determine whether solicitors were performing their duties consistent with CFM's instructions and the Advisers Act.

123. These practices were material to CFM's clients, and Elstun knew or should have known that the above practices were material.

124. Elstun, as the majority owner and Investment Manager of CFM, was responsible for CFM's adoption and implementation of policies and procedures, and he either knew or was reckless in not knowing of these compliance violations. As a result, Elstun knowingly or recklessly substantially assisted CFM's failure to adopt and implement written policies and procedures reasonably designed to prevent violations of the Advisers Act and the rules thereunder.

## VI. Elstun Aided and Abetted CFM's Failure to Maintain Written Client Agreements.

125. Section 204(a) of the Advisers Act provides, in part, that investment advisers shall "make and keep for prescribed periods such records (as defined in section 78c(a)(37) of this title), furnish such copies thereof, and make and disseminate such reports as the Commission, by rule, may prescribe as necessary or appropriate in the public interest or for the protection of investors. All records (as so defined) of such investment advisers are subject at any time, or from time to time, to such reasonable periodic, special, or other examinations by representatives of the

Commission as the Commission deems necessary or appropriate in the public interest or for the protection of investors." Rule 204-2(a)(10) thereunder lists as among the books and records required to be maintained by investment advisers: "All written agreements (or copies thereof) entered into by the investment adviser with any client or otherwise relating to the business of such investment adviser as such." Registered investment advisers must make and keep all required records "true, accurate and current."

126.    CFM did not maintain written client agreements for several of its clients. As set forth above, CFM, through Elstun, falsified at least three Asset Management Agreements and produced these agreements to the SEC. CFM violated Section 204(a) and Rule 204-2(a)(10) through this misconduct.

127.    Elstun, as the majority owner and Investment Manager of CFM, was responsible for CFM's written client agreements and maintaining those written client agreements, and he either knew or was reckless in not knowing of these recordkeeping violations. As a result, Elstun knowingly or recklessly substantially assisted CFM's failure to maintain true and accurate written client agreements.

### FIRST CLAIM FOR RELIEF
**Fraud by an Investment Adviser: Section 206(1) of the Advisers Act**

128.    The SEC realleges and incorporates by reference paragraphs 1 through 127 as though fully set forth herein.

129.    At all relevant times, Elstun was an "investment adviser" within the meaning of Section 202(a)(11) of the Advisers Act [15 U.S.C. §80b-2(a)(11)].

130.    In connection with charging advisory fees that exceeded agreed upon amounts and charging fees to which clients did not agree on non-advisory assets, as detailed above, Elstun, while acting as an investment adviser, by the use of the mails or any means or

instrumentalities of interstate commerce, directly or indirectly with scienter, employed a device, scheme or artifice to defraud any client or prospective client.

131.    By reason of the foregoing, Elstun, directly or indirectly, violated and, unless restrained and enjoined, will again violate Section 206(1) of the Advisers Act [15 U.S.C. § 80b-6(1)].

## SECOND CLAIM FOR RELIEF
### Fraud by an Investment Adviser: Section 206(2) of the Advisers Act

132.    The SEC realleges and incorporates by reference paragraphs 1 through 127 as though fully set forth herein.

133.    At all relevant times, Elstun was an "investment adviser" within the meaning of Section 202(a)(11) of the Advisers Act [15 U.S.C. §80b-2(a)(11)].

134.    As a result of the conduct alleged herein, Elstun, while acting as an investment adviser, by the use of the mails or any means or instrumentalities of interstate commerce, directly or indirectly, engaged in a transaction, practice, or course of business which operated as a fraud or deceit upon any client or prospective client.

135.    By reason of the foregoing, Elstun, directly or indirectly, violated and, unless restrained and enjoined, will again violate Section 206(2) of the Advisers Act [15 U.S.C. § 80b-6(2)].

## THIRD CLAIM FOR RELIEF
### (In the Alternative)
### Aiding and Abetting Fraud by an Investment Adviser
### Sections 206(1) and 206(2) of the Advisers Act

136.    The SEC realleges and incorporates by reference paragraphs 1 through 127 as through fully set forth herein.

137.    At all relevant times, CFM was a registered investment adviser.

138. As alleged above, in connection with charging advisory fees that exceeded agreed upon amounts and charging fees to which clients did not agree on non-advisory assets, CFM violated Sections 206(1) and 206(2) of the Advisers Act.

139. As a result of the conduct alleged herein, Elstun knowingly or recklessly provided substantial assistance to CFM in furtherance of its violations alleged in the prior paragraph.

140. By reason of the foregoing, Elstun, directly or indirectly, aided and abetted and, unless restrained and enjoined, will again aid and abet violations of Section 206(1) of the Advisers Act [15 U.S.C. § 80b-6(1)].

**FOURTH CLAIM FOR RELIEF**
**Aiding and Abetting Recordkeeping Violations**
**Section 204(a) of the Advisers Act and Rule 204-2(a)(10) Thereunder**

141. The SEC realleges and incorporates by reference paragraphs 1 through 127 as through fully set forth herein.

142. At all relevant times, CFM was a registered investment adviser.

143. As alleged above, CFM violated Section 204(a) of the Advisers Act and Rule 204-2(a)(10) thereunder.

144. As a result of the conduct alleged herein, Elstun knowingly or recklessly provided substantial assistance to CFM in furtherance of the violations alleged above.

145. By reason of the foregoing, Elstun, directly or indirectly, aided and abetted and, unless restrained and enjoined, will again aid and abet violations of Section 204(a) of the Advisers Act [15 U.S.C. § 80b-4(a)] and Rule 204-2(a)(10) thereunder [17 C.F.R. §§ 275.204-2(a)(10)].

41

## FIFTH CLAIM FOR RELIEF
### Aiding and Abetting Fraud by an Investment Adviser (The Custody Rule)
### Section 206(4) of the Advisers Act and Rule 206(4)-2 Thereunder

146.     The SEC realleges and incorporates by reference paragraphs 1 through 127 as through fully set forth herein.

147.     At all relevant times, CFM was a registered investment adviser.

148.     As alleged above, CFM violated Section 206(4) of the Advisers Act and Rule 206(4)-2 thereunder.

149.     As a result of the conduct alleged herein, Elstun knowingly or recklessly provided substantial assistance to CFM in furtherance of the violations alleged above.

150.     By reason of the foregoing, Elstun, directly or indirectly, aided and abetted and, unless restrained and enjoined, will again aid and abet violations of Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-2 thereunder [17 C.F.R. §§ 275.206(4)-2].

## SIXTH CLAIM FOR RELIEF
### Aiding and Abetting Fraud by an Investment Adviser (The Cash Solicitation Rule)
### Section 206(4) of the Advisers Act and Rule 206(4)-3 Thereunder

151.     The SEC realleges and incorporates by reference paragraphs 1 through 127 as through fully set forth herein.

152.     At all relevant times, CFM was a registered investment adviser.

153.     As alleged above, CFM violated Section 206(4) of the Advisers Act and Rule 206(4)-3 thereunder.

154.     As a result of the conduct alleged herein, Elstun knowingly or recklessly providing substantial assistance to CFM in furtherance of the violations alleged above.

155.     By reason of the foregoing, Elstun, directly or indirectly, aided and abetted and, unless restrained and enjoined, will again aid and abet violations of Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-3 thereunder [17 C.F.R. §§ 275.206(4)-3].

## SEVENTH CLAIM FOR RELIEF
### Aiding and Abetting Fraud by an Investment Adviser (Compliance Procedures)
### Section 206(4) of the Advisers Act and Rule 206(4)-7 Thereunder

156.    The SEC realleges and incorporates by reference paragraphs 1 through 127 as through fully set forth herein.

157.    At all relevant times, CFM was a registered investment adviser.

158.    As a result of the conduct alleged herein, Elstun knowingly or recklessly provided substantial assistance to CFM in furtherance of the violations alleged above.

159.    By reason of the foregoing, Elstun, directly or indirectly, aided and abetted and, unless restrained and enjoined, will again aid and abet violations of Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-7 thereunder [17 C.F.R. §§ 275.206(4)-7].

## RELIEF SOUGHT

**WHEREFORE**, the SEC respectfully requests that this Court:

### I.

Find that Elstun committed the violations alleged in this Complaint;

### II.

Enter an injunction, in a form consistent with Rule 65 of the Federal Rules of Civil Procedure, permanently restraining and enjoining Elstun from violating, directly or indirectly, the laws and rules he is alleged to have violated in this Complaint;

### III.

Order Elstun to disgorge all ill-gotten gains, together with pre-judgment interest, derived from the activities set forth in this Complaint;

### IV.

Order Elstun to pay civil money penalties pursuant to Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)]; and

## V.

Grant such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

The SEC demands a trial by jury on all claims so triable.

Respectfully submitted, March 29, 2021.

*s/ Zachary T. Carlyle*
Zachary T. Carlyle
Attorney for Plaintiff
UNITED STATES SECURITIES AND
EXCHANGE COMMISSION
1961 Stout Street, 17th Floor
Denver, Colorado 80294
(303) 844-1000
CarlyleZ@sec.gov